Nelson, J.,
delivering tbe opinion of tbe court:
Rhea and wife, tbe complainants to- tbe original bill, signed a title bond, bearing date 29tb of March, 1855, in wliicli they agreed to convey tbe tract of land described therein, containing two hundred acres, more or less, on tbe payment of two notes executed by Iseley, tbe one for $675, due September 1, 1855, and tbe other for $550, due March 15, 1857. An additional consideration of $325 was paid by tbe sale and delivery of a horse and colt and other property, and a small sum in cash, so that tbe entire consideration for tbe tract of land was $1,550. Tbe amount of tbe notes was subsequently paid to* said Rhea, but at what time does not clearly appear. On tbe 2d of December, 1861, Rbea and wife signed a deed for tbe land, purporting to convey it in fee and with covenants of warranty to said Iseley) and tbe first question raised by tbe bill and cross-bills — the allegations of which it is not necessary to detail —is whether this deed for tbe land, belonging exclusively *223 to the wife, was acknowledged by her, upon privy examination, in such manner as to malee it binding upon her, or to entitle Iseley, in a court of equity, to relief?
Mrs. Rhea denies that she either executed or acknowledged the deed, freely and voluntarily, and the proof as to its acknowledgment is in substance, as follows:
"W". L. McKinley, formerly deputy clerk of the county court of Meigs county, and also clerk of the circuit court, testifies, in his deposition, that the deed was acknowledged before him as acting deputy clerk of the county court, by James Rhea and wife, on the 2d of December, 1861; that he took the acknowledgment in the common form prescribed by law, the husband and wife both being present and making the same; that Mrs. Louisa J. Rhea then walked with the deputy into his family room, where, in his own language, “he took her privy examination according to the requirements of the laws of Tennessee; that he did not enter her acknowledgment upon the deed; that the reason why he did not do so was that the number of acres was not expressed in the deed; that the clerk was then required by law to collect a state and county tax, per acre, on conveyances in fee; that he advised Iseley, the vendee, to have another deed made, which he said he would do; and that he, the witness, therefore suspended the usual entries to be made upon the probate book and upon said deed, but noted in the margin of the deed the words, in pencil, ‘2d December, 1861,’ and that he, at all times, remembered the transaction, because, as he says, the duty of the clerk relative to the same had not been fully performed, and his memory was kept refreshed by conversations after he had gone out of office, and by letters, addressed to him for the last two. years in the State of Arkansas.”
Upon the statement of the clerk, corroborated by other witnesses, and elaborated upon cross-examination, it is urged by Iseley’s counsel .that the privy examination of *224 Mrs. Bhea was perfect and complete, and had the effect to divest the title; that the certificate of the clerk and the registration of the deed are intended only to furnish evidence as to the fact of the acknowledgment and to give notice; and that the omission of the clerk, who has gone out of office and cannot now perform the duty enjoined upon him by law to make the requisite certificate upon the deed, is such an accident as can be relieved against in a coui’t of equity.
Without reviewing the statutes which were in force in North Carolina and Tennessee prior to our present Code, a clear and concise statement of which is contained in 1 Meigs’ Dig., sec. 1071, and observing, merely, that the common law mode of passing the estate in lands of a feme covert by fine and recovery, never was in use in either state, it will be sufficient to refer to the statute in force at the time when the alleged probate of the deed in controversy occurred. By the Code, sec. 2076 [Shannon’s Code, sec. 3753], it is provided that “every deed or other instrument of writing executed by husband and wife, and acknowledged and proved,and registered in the manner hereinafter prescribed, shall bind them, their heirs, or assigns. The officer or court' before whom the execution of such deed or instrument is acknowledged or proved, shall examine the wife, privily and apart from her husband, touching her voluntary execution of the same and her knowledge of its contents and effects; and if she acknowledges or states that she executed the same freely and voluntarily, and without any compulsion on the part of her husband, and the clerk or other officer is satisfied that she fully understands the same, he shall, in addition to the certificate of acknowledgment above described [in sec. 2042 — Shannon’s Code, sec. 3717], also put on the back of the deed, or annex to it, the following certificate:
“And-, wife of the said-, having appeared before me privately and apart from her husband, the said *225 -, acknowledged the execution of the said deed to have been done by her freely, voluntarily and understand iugly, without compulsion or constraint from her said husband, and for the purposes therein expressed. Witness -, clerk of said court, at office; this-day of ———, 18 — .”
Sections 2077 and 2078 [Shannon’s Code, secs. 3754 and 3755], provide for the privy examination of the wife under a commission, where she is unable, from sickness or any other cause, to appear before the. clerk; and sec. 2079 [Shannon’s Code, sec. 3756] declares that -“the said commission, certificate of privy examination and probate shall be registered with the deed in the county where the land lies.” A fraudulent certificate of acknowledgment and the false registration, etc., of a deed, are made felonies by secs. 4731, 4732 [Shannon’s Code, secs. 6609, 6610]; and in sec. 2082 [Shannon’s Code, sec. 3759], it is enacted that “if a clerk omit any words in the certificate of a privy examination by him taken of a married woman, touching the execution of any deed or other instrument by her executed, he may at any time, on application of either of the parties interested, correct such error, mistake or omission, making oath, in open court, to the truth of such correction.” It is further declared, in sec. 2803 [Shannon’s Code, sec. 3760], that “the register shall record the correction in the proper book of his office, and make a reference to the same on the margin opposite the original register of the certificate.”
It is apparent from these sections that it was the intention of the legislature to make the execution of a deed by a married woman one of the most solemn acts known to the law. The policy of so making it has been recognized in the legislation of every state in the union; and in England, fines and recoveries have been abolished by the statute of 3 and 4 William IY., ch. 74, and the wife’s real estate is *226 now transferred, on a private examination, apart from her husband, in a mode very similar to that so generally adopted throughout the United States. Tyler on Inf. & Cov., 504. At common law the existence of the wife was, during the marriage, and as to most purposes, regarded as merged in that of her husband, and she was and is still entirely incapable of making a contract, and any conveyance of hers, except by some matter of record, was and is absolutely void. "The disability of the wife to' contract so as to bind herself — it has been well observed — arises not from want of discretion, but because "she has entered into’ an indissoluble connexion by which she is placed under the power and protection of her husband, and because she has not the administration of property, and has given up to him all personal property in possession, and the right to receive all such as may be reduced into possession.” 2 Kent. (6th ed.) 150 m. To a certain extent, not material here to be considered, this disability has been removed by the liberal and enlightened legislation of this state, in the Code, p. 487, Art. III., and in secs. 2805, 3319, 3433, 4052 [Shannon’s Code, secs. 4505, 5068, 5189, 5867], as well as other sections and subsequent statutes not here referred to. Aside from these statutory provisions, it has always been the policy of our state legislature to place as many safeguards around the real estate of the wife as is consistent with the marital relation, the abolition of entails, and the migratory habits of our people. Heal estate has been regarded as the surest means of support to the wife and her children; and, in view of the mutability of human affairs, the liability of the husband to become embarrassed in his speculations and dealings, and the danger to the wife of being left to dependent widowhood with a helpless family around her, the law has provided' a means, too often illusory and ineffectual, of enabling her to guard against the almost resistless influence of her husband, as well as her own ignorance and inexperience in respect to legal trans *227 actions, by causing her to- be examined apart from her husband as to her own voluntary action in parting with her real estate. It was not the intention of the statutes that this examination should be a mere formula without substance or meaning, nor is the action of the clerk, in taking her - examination, altogether ministerial in its character. It was designed to be a judicial act, or at least assimilated to- a judicial act, for it is not only provided that she shall state that she executed the deed freely, voluntarily and without compulsion on the part of her husband, but it is expressly enacted that the clerk or other officer shall be satisfied that she fully understands the same. This implies that the clerk or other officer is not simply to inquire whether she signed the deed freely and voluntarily, but that he shall fully explain to her the consequences of her act, or otherwise ascertain from her statement that she is fully advised of the fact that, by executing the deed, she will, in the absence of any equitable contract with her husband, forever deprive herself of her estate, without any claim whatever to the proceeds of its sale, and that such proceeds become the property of her husband and cease to be within her own control. The clerk or other officer is presumed to be a disinterested and impartial adviser or monitor. He is a sentinel placed by the law between the husband and the wife to guard her rights alike against fierce and insidious approaches. He is the only shield interposed between the weakness of the wife' and the power of the husband; or, to change the metaphor, the last barrier that may oppose the utter destruction of her only remaining right. If the clerk is satisfied that she has not the freedom of her own will, or has been ignorantly deluded into acquiescence and does not comprehend the nature of the act she is about to- perform or complete, then he cannot, acting as he does under the obligation of an oath, truly certify that, in executing the deed, she has acted freely, voluntarily and without compulsion. He must be satisfied not merely that she understands the nature of the *228 act, but tliat she fully understands it; and, as evidence that be has performed his duty, he must put- on the back of the deed, or annex to it, the prescrbed certificate. It is impossible, from the nature of the acts to be done by the married woman wffio acknowledges the deed, and the clerk who makes the privy examination and takes the acknowledgment, that the execution of the deed, so as to pass the title, can be considered perfect and complete until the official ad <of the clerk or other officer is made perfect and complete by meeting, in letter and spirit, every requirement of the statute. The clerk is not to make the- certificate until after he is satisfied that the married woman fully understands the nature of the act; and how is it to be proven that he is so satisfied unless he certifies it in the precise manner directed? Although the statute does not in express terms declare it, it is manifest that the privy examination and the certificate were intended to be contemporaneous acts. The statute makes no provision for the cases put in argument. If the clerk is stricken by paralysis, or with lightning, so as to be deprived of life or [rendered] incapable of action before he makes his certificate, the failure to- make it is not such an accident as equity can relieve against. The statute has made no exceptions and the courts can make none. No court can know otherwise, than from the certificate, that the clerk is satisfied that the act has been understandingly performed. Bystanders may be present and hear the examination, but no one other than the clerk can certify to the fact that he is satisfied with it. In the case under consideration it may be true, as stated by the clerk in one form of expression, that he “took the privy examination according to the requirements of the laws of Tennessee,” or, in another, that “the deed was fully acknowledged by Rhea and wife, and the privy examination of Mrs. Rhea was fully and properly taken;” and yet, if a court of equity had the power to supply the certificate, or relieve the supposed accident, this evidence would be insufficient to authorize its active *229 interposition, for the statement is defective in not showing that Mrs. Rhea ackowledged to the clerk that the execution of the deed was done freely, voluntarily, etc., and contains not a narration of the examination, but the clerk’s opinion of its legal effect; and it may be observed further, that the clerk does not testify that he was satisfied she fully understood it. While there is ample evidence in the record to show that Mrs. Rhea is an intelligent woman, and fully capable of understanding the nature of the act alleged to have been done, this is not the kind of proof contemplated. Were witnesses permitted to express their opinion as to whether she acted knowingly, voluntarily and without coercion, it would open a boundless field of investigation, and substitute them as judges in pla.ce of the sworn officer of the law. The conveyance can be made alone in the mode directed by the statute, and cannot be considered as the complete act of the wife until the certificate has been placed upon it. .
In other states where similar statutes prevail, it has been held, either with the peculiar language employed, or by judicial construction, that husband and wife cannot convey the wife’s lands by separate deeds; that she is not estopped by signing a bond to convey; that a deed, not duly acknowledged by her, conveys only the husband’s use, and that the clerk’s certificate must actually show that the deed has been explained to her, and that she was fully informed of her rights. See Glidden v. Strupler, 52 Penn., 400; Baxter v. Bodkin, 25 Ind., 172; O’Perrall v. Simplot, 4 Green (Iowa), 162; Pease v. Barbress, 10 Cal., 436; Garrett v. Moss, 22 Ill., 223; Elliott v. Pearce, 20 Ark., 508; Dewey v. Campan, 4 Mich., 565; Dalton v. Murphy, 30 Miss. (1 George), 59; Louder v. Blythe, 27 Penn. State R., 22; Ibid., 170; McCreary v. McCreary, 9 Rich. Eq. (S. C.), 84; Selover v. Commercial Co., 7 Cal., 266. See also Reeve’s Dom. Rel., 3d ed., 195, note 1, and Barrett v. Shackelford, 6 J. J. Mar., 532.
*230 So, in this state, it has been held, and we approve the decisions, that the wife cannot, by her own deed alone, pass her freehold estates, and that it cannot be conveyed in any other mode than that prescribed by statute. Cope v. Meeks, 3 Head, 387; Gillespie v. Worford, 2 Cold., 637. See also Matherson v. Davis, 2 Cold., 443; Norment v. Wilson, 5 Hum., 310, 311; Perry v. Calhoun, 8 Hum., 554; Montgomery v. Hobson, Meigs, 437; Henderson v. Rice, 1 Cold., 225; Mount v. Kesterson, 6 Cold., 463. Declaring, as we do, that a court of equity has no jurisdiction to treat the neglect of the clerk to record the privy examination upon the deed as an accident or mistake upon which relief can be obtained against a feme covert, it may be observed that, if any doubt existed on the subject, it clearly appears, from the clerk’s evidence, that there was no accident or mistake, in point of fact, as he did not enter Mrs. Rhea’s acknowledgment upon the deed for the reasons already stated, and especially that he advised Iseley, the vendee, to have another deed made, which he said he would do. It is manifest from the evidence that neither the clerk npr Iseley, the vendee, regarded the privy examination as complete; that Iseley did not intend to rely upon the deed, and that he cannot now claim, as an accident or mistake, the failure to certify the privy examination.
The chancellor declared the deed from Rhea and wife null and void, but decreed that Mrs. Rhea should account for the purchase money; that Iseley should account for the rents and profits; but receive a credit for taxes paid by him, and also for permanent improvements, and that, if there should be a balance in his favor, the same should be a lien on the tract of land, to be enforced, if necessaiy, by the order of the court.
So much of the decree as declares the deed void is warranted by the Code, sec. 2481 [Shannon’s Code, see. 4234], which declares that "the interest of a husband in the real estate of his wife, acquired by her either before or after *231 marriage, by gift, devise, descent, or in any other mode, shall not be sold or disposed of by virtue of any judgment, decree or execution against him; nor shall the husband or wife be ejected from, or dispossessed of, such real estate of the wife by virtue of any such judgment, sentence or decree; nor shall the husband sell his wife’s real estate, during her life, without her joining in the conveyance in the manner prescribed by law in which married women shall convey lands.” But the question as to whether Mrs. Rhea shall account for the purchase money, is of more difficult solution.
It is insisted that by signing the title bond in the first instance and negotiating the contract with Iseley in person, as well as by claiming a horse and perhaps some of the other property delivered in part consideration for the land, Mrs. Rhea perpetrated such a fraud as makes it equitable that she should account for the. purchase money. Rhea and wife are specially interrogated in Iseley’s answer and cross-bill; and, in their separate answers, fully deny the fraud, and state, in substance, that in any conversations which she had with Iseley preceding the execution of the title bond, she acted under the undue influence of her husband. The answers are not disproved in any material point, either by two witnesses, or by one with strong corroborating circumstances. There are statements by separate witnesses contradictory of some of the allegations in the answers which need not be here analyzed, as there is no proof that Mrs. Rhea'ever appropriated to her separate use any of the property, which, with a small amount in cash, amounted to1 the said sum of $350; nor is there any evidence disproving the statement, in Rhea’s answer, that the notes for the residue of the purchase money were made payable and actually paid to him alone. Her claim to and use of “the spotted horse,” delivered on the day of the contract in 1855, about which so much is said in the record and in argument, neither proves that she negotiated the contract or practiced *232 a fraud, and are consistent wit]! her statements as to the undue influence of her husband, and that she ultimately signed the deed and went to acknowledge it under the threat of a lawsuit and in ignorance of her rights. But, although these particular acts do' not establish the charge of fraud, it is insisted that if a married woman covenants to convey land, and by reason of her coverture the covenant is void, it would be fraud for her to avoid the contract without restoring the purchase money; and, in support of this position, Iseley’s counsel rely upon Pilcher & Cataulis, adm., v. Smith and wife, 2 Head, 208, and the authorities cited in that opinion.
The facts of that case, briefly stated, are that a free woman of color purchased a lot of ground from a married white woman, to whom, or to whose husband, as her agent, the purchase money was paid. It is intimated in the opinion that the husband was the real owner of the lot, and that it had been conveyed to the wife to protect it against his creditors. He executed a deed, but his wife refused to join him in it; and, after the purchaser had held possession nearly ten years, she caused a suit of ejectment to be brought for the lot. At the time of the original contract she had executed a covenant to convey, on the payment of the purchase money. On a bill filed to enjoin the action ol ejectment, and for other and general relief, the chancellor refused a decree for specific performance, but decreed that the purchase money should be refunded with interest, and declared it a lien on the lot; and his decree was affirmed on the ground that the case, in the language of the court, “was an aggravated fraud against an innocent purchaser, whose caste and condition entitled her to expect the observance of good faith on the part of those who had dealings with her.” 2 Head, 211.
It is manifest from the opinion in that case that the wife acted freely and voluntarily; that her husband, by executing a conveyance, was willing, so far as in his power, to *233 complete the contract, bnt that she utterly refused, in the exercise of her own will, to join him in the deed, and determined to perpetrate, and did perpetrate, a gross fraud. But in the case at bar, it is clearly shown that Mrs. Rhea joined her husband in signing the title bond, and also in executing the deed, and, in doing so; may well be presumed to have acted under Iris influence and control, especially as no privy examination was taken in the mode prescribed by law to show that her acts w'ere free and voluntary. She fully denies that she received, or authorized her husband to receive, any part of the consideration; and it is not shown that he acted as her agent in receiving the purchase money, or that she ever enjoyed any part of it, as before stated, to her separate use. On the contrary, a female witness, who resided in the family, proves that after the trade was made, and in the year 1835, Mrs. Rhea said to her husband and to Iseley, that she wished them to take the stock back and let her keep the land; that they desired her to make a deed for the land, and she then declared she never would make it.
Mrs. Rhea admits, in her answer, that she signed the title bond after long and persistent persuasion on the part of her husband and of Iseley, and after her husband had become much intoxicated from ardent spirits furnished him by Iseley, but declares that, in signing the bond, she acted “decidedly against her own will and wish.” She also admits that she signed the deed, but states that, in doing so, she did not act freely, voluntarily and willingly, but acted under the undue influence of her husband, and the declaration of Iseley and her brother that they had been informed by lawyers that a chancery court, upon a bill filed for that purpose, would divest the title out of her and make her pay the costs, and the threat of Iseley that he would file such a bill. These statements are no disproved by the evidence of the single witness who staid all night at Rhea’s, with Iseley, on the night before the title bond was signed, and who states that Iseley made the trade principally with Mrs. *234 Rhea herself; nor are they disproved, as already remarked, by the evidence of other witnesses. They are corroborated, in part, by the statement of the witness that Rhea “set out some spirits at supper, that witness took a drink, that Iseley took some and Mr. Rhea took some, and also next morning we had a small dram apiece, and that was the end of it.” They are also corroborated by other testimony to the effect that Rhea and wife were both in affluent circumstances at the time of their marriage; that he was a bad manager; that his habits were intemperate, and that he has run through the property.
Rut it would be useless further to detail the evidence, as we are satisfied, after a diligent examination of the whole case, that Mrs. Rhea did not, either in law or in fact, perpetrate a fraud, and should not be compelled to account for purchase money which never came to her hands, and was evidently paid to her husband without her authority, after she had distinctly avowed her purpose never to execute the deed, and with full knowledge that she was dissatisfied with the contract.
As all the parties are before this court, the chancellor’s decree will be affirmed, with the following modifications:
1. Mrs. Rhea will not be held to account for any part of the purchase money.
2. Iseley will account to Mrs. Rhea for the rents and profits, with interest from the end of each year, and be credited for any permanent improvements actually enhancing the value of the land, but not to an amount greater than the rents and profits. He will also be credited with sums paid for taxes, with interest.
3. If the rents and profits exceed the taxes and improvements, the amount of the excess will be decreed to the separate use of Mrs. Rhea.
4. James Rhea will be charged, in favor of Iseley, with the amount of purchase money, $1,550, and interest from the time it became due.
*235 5. All tbe costs in tbis court, and in tbe court below, will be adjudged against Iseley, wbo will bave a decree oyer against James Ebea.
6. Tbe account will be taken by tbe clerk of tbis court, wbo may, if be shall deem it necessary, bear- further proof as to tbe matters of account. He will report to tbe present term, if practicable:, but if not, to tbe next.